Ashburn, J.
The first question we will consider arises on the exceptions by the defendant below to the special charges given, the special charges refused, and the general charge to the jury.
Plaintiffs below requested the court to give in charge to the jury a series of eight propositions, each of the series *88 numbered. Some of them the court gave in form as requested ; others as modified in the general charge. To these charges the defendant below excepted in this form, viz: “ To the giving of which charges the defendant at the time excepted.”
This exception, we think, too general. If it was the purpose to except to each proposition in the series, the exception should have been to each, or so framed as to distinctly indicate such purpose. If intended as an exception to the whole series, it was insufficient. "Where the exception is to the whole series, and in it is found one or more sound propositions, as in this case, a general exception to the series as a charge is insufficient. 1 Seld. 422.
Defendant below requested the court to give in charge to the jury a series of twenty-one requests ; not each an independent proposition, but a portion of them independent propositions, and others depending one upon another. The first request in the series was given, many of them wholly refused, and the residue given as modified in the general charge. To this ruling an exception was taken in this form : “ To which refusal and modification of said charges defendant at the time excepted.”
The exception we think insufficient. Some of the propositions in the series were not sound, and the rule is firmly settled where one of a series of propositions presented in one request for a charge is unsound, an exception to a refusal to charge the entire series, as requested, can not be maintained. 3 Otto, 46; 11 N. Y. 416; 6 N. Y. 233; 7 N. Y. 236; 40 N Y. 556; 45 N. Y. 556; 47 N. Y. 570; 30 Ohio St. 104; 30 Barb. 246.
. To the general charge of the court the defendant took exception in this form : “ To which general charge of the court, the defendant, by his counsel, at the time excepted, and excepted also to each proposition of law therein contained differing from the several specific charges asked by defendant.” This form of exception is clearly obnoxious to the settled law upon this subject. It is not the duty of a reviewing court to analyze and compare the requests, *89 modifications, and charge, to discover what particular portions are intended to bp excepted to. The chief office of an exception is to call the attention of the' trial court to the precise point as to which it is claimed it has erred, that the court may, then and there, consider it, and give other and different instructions to the jury, if, in its judgment, it has erred and should do so. An exception in the form we are considering wholly defeats that object. 25 Ohio St. 584; 47 N. Y. 576; 3 Otto, 46; Servis v. Stockstill, 30 Ohio St. 418; 3 Otto, 291; The P. Ft. W. & C. Railway v. Probst, 30 Ohio St. 104.
II. Many objections and exceptions to the admission of testimony offered by plaintiff below were made and taken by defendant below.
So far as practical, we have endeavored to classify the .testimony objected to, and exceptions. To consider and report upou each exception would be an unnecessary labor, and lead to no better practical result than to consider a single case of exception as the representative of a class.
a. The first class claiming consideration embraces all cases of special loss of steamboats from unknown causes, and may be represented by the following question and answer, taken from the testimony of the witness, E. C. Eindren.
“ Q. 17. Have you known of any instance of steamboats navigating the Mississippi river and its tributaries sustaining injuries in their hulls, by striking stumps, snags, and landings, by which they leaked or were sunk, and not discovered until some time after they had occurred; and if yea, give them ?
“A. I have known such instances. The "W. N. Sherman, in the Yazoo river, made a landing on the left hand side of the river; we run from that landing probably three miles, when we discovered the boat was filling with water; landed on the right hand shore, and she sank in about fifteen or twenty minutes ; this was in the year .1856; we found, through means of divers, that she had struck, on the left hand side of the river (where we had landed), a *90 stump, and no one knew anything about it at the time; the divers found the hole afterward, and stopped it, and we raised the boat; that was tlie only instance that occurred to myself.”
¥e think this class of testimony objectionable on both principle and authority. It was calculated to create as many collateral issues as special cases of such loss introduced. In this case, the witness states: “No one knew anything about it at the time.” This is but the witness’ opinion on a subject upon which his opinion was not competent testimony. Other persons on the Sherman at the time might have noticed the shock occasioned by the blow that broke the vessel. This would probably become a disputed question, calling for the testimony of all the persons on the Sherman at the time of the accident, to settle the question of fact as to her case. The testimony of one credible witness, that he felt and noticed the blow, would properly outweigh the testimony of many who did not notice the fact. Here would be a vexed, but valueless, collateral issue. If such testimony is competent, coming from the plaintiff, the right of the defendant to meet and controvert it is unquestionable.
Very many cases were introduced in testimony, on the part of plaintiff, where steamboats had met with some unknown accident, and, suddenly springing a leak, sunk. This class of testimony was incompetent, because calculated to surprise, and take undue advantage of defendant at the trial. Ordinarily, he could not be prepared to meet and contest the merits of each particular case of loss, from unknown cause, introduced. To deprive him of this privilege would be the denial of a legal right, and to admit them would overwhelm the case with collateral issues of fact— distract judicial investigation — leading to no valuable legal result.
It is stated and claimed, this class of testimony was introduced and admitted only to show the nature and peril of such navigation. As testimony-in-chief, such testimony was not competent for any purpose. On cross-examination, *91 it would be competent for a party to propound such questions as would call out such special cases. This could be done in order to ascertain the grounds of the witness’ judgment, and tending to test the correctness of his testimony. If special cases were called out on cross-examination, the party calling for them would be bound by the answers given, and no collateral issues could arise on its admission.
Greenleaf states the rule thus, and we think it sound and applicable: “ This rule excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute, and the reason is that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them ; and moreover, the adverse party, having had no notice of such a course of evidence, is not prepared to rebut it.” 1 Green-leaf, § 52.
b. Objection was made and exceptions taken to the opinion of witnesses, of which the following question and answer, so far as quoted, are representative. The question was not always put in this exact form, but substantially so, when seeking testimony of this character.
G. A. Houghton:
“Q. 4. State your opinion, derived from your knowledge, of the build and use, of steamers used on the lijwer rivers, upon the points, whether good, seaworthy steamers, properly laden, do or not sometimes receive serious injuries to their hulls, which are not known at the time to be such by the officers and crew, and which do not for-some reason at once fully develope themselves, but which finally cause them to leak seriously, and to sink unless the leak can be controlled by the pumps or found and stopped.
A. Tes, sir. I think cases of that kind do occur frequently in grounding, and straining the butts and opening the seams. Cases of that kind have beeu known to occur.”
¥e discover no valid objection to this question, nor to the answer, so far as quoted. The nature and necessities of the ease and issues made authorize the introduction’, as *92 competent testimony, of the opinions of persons educated by experience in the nature of perils, open and bidden, attending the navigation, by steamboats, of the western rivers.
The petition substantially alleges, that the Wade Plampton, when insured, was tight, sound, and seaworthy, and so continued until she met with the unknown fatal accident; that while navigating a privileged water, she struck some unknown substance which caused her to leak and sink, from a peril of the river, which peril was covered by the insurance. Upon these allegations of fact the answer joins issue.
As we understand the issues, the seaworthiness of the Hampton, at the time the policy sued on was issued, is not questioned, but her seaworthiness at the time she last left the port of New Orleans is a contested fact. If seaworthy when insured the presumption of her seaworthiness would continue up to the time of her loss, unless some known intervening cause is shown that rendered her unseaworthy after she was insured. If shown to be unseaworthy when she last left New Orleans, her loss would be attributed to such unseaworthiness and the contest be at an end. On the other hand, if seaworthy when she left the port of New Orleans on her last trip, she will be presumed to remain seaworthy during all that trip. If, however, during the voyage, the Hampton suddenly began to leak, without any apparent or known cause originating in some peril covered by the policy, a new presumption arises, that of uuseaworthiness. This new presumption, however, is not conclusive, and may be countervailed by testimony. This new presumption shifts the burden of proof on the insured, to show that the vessel was lost by some peril insured against. He may not be able, and is not required in such case, to show the exact cause of the loss, but may introduce testimony tending to show a probable, or even possible, cause for the loss. As testimony tending to show a- probable or possible cause of loss, experienced navigators, who are acquainted with the nature and extent of the 'obstrue *93 tions in the privileged waters, the dangerous character of their navigation, and the fact of the open and hidden perils connected with the navigation of the western- rivers, are competent to express an opinion as to the probable cause of the loss of the Wade Hampton, if so it shall be, that she was lost by reason of some unknown cause. When from the nature of the case, opinions of persons acquainted with the nature of the subject under consideration, are the best testimony to be obtained, they are competent. If the Hampton was seaworthy when she started from the port of New Orleans on her last voyage, and the cause of her suddenly springing a leak is unknown, then the opinions of experienced river navigators familiar from actual experience and observation with the known perils and the fact of unknown perils incident to such navigation, are in the nature of expert testimony and clearly competent.
c. Exceptions were taken to questions and answers substantially as the following :
Captain Goddin was interrogated :
“Q. 18. If you know, state what caused the sinking of the Hampton ?
A. She must have had some violence, but what I can not state.
Q. 19. What do you mean by some violence ?
A. She must have had some blow or strain — opening her butts — either by lauding against the bank, or some other cause.”
“Q. 15. E. C. Eindren : Do you know whether or not the Hampton was seaworthy on this voyage on which she was sunk ?”
“Q. 9. John H. Kelly : Will you state how she was navigated on the voyage down, and whether she made a great number of landings, and about how many, and whether she might have sustained any injury in making any of those landings, or in the navigation, that might have caused her to leak, by which leak she was caused afterward to. sink.”
“ Q. 35. Peter Pepper: What was the condition of the *94 Wade Hampton as to seaworthiness on the trip from Vicksburg to New Orleans, on which she was lost ?
A. She was perfectly safe at the time she was lost. I considered her perfectly safe and seaworthy to travel on up to the time she was lost.
Q. 39. Have you any idea as to what caused the Wade Hampton to leak on the trip on which she sank ?”
Questions and answers within the scope of these are not objectionable. Some of them would elicit facts within the knowledge of the witness, others mingled fact and opinion, and others again opinion only. Where the witnesses'are experienced river-men, familiar with steamboats and steamboat navigation on the western rivers, well acquainted with the Hampton, the manner in which she had been navigated; in her peril saw and comprehended her condition so far as it could be seen andknown, they are persons competentto make answers in response to such questions. Where the question put to the witness would elicit only the knowledge of the witness, no valid objection could exist. Where, from the nature and necessities of the question to be developed, the best testimony the subject-matter affords must be “ compounded of fact and opinion,” such testimony is admissible.
The application of the principle here stated is not to extend in this case beyond the scope of the cited questions and answers thereto.
d. Exception was taken to questions and answers tending to show that steamboats of the class to which the Hampton belonged were designated “ cotton boats,” and that river-men aud insurance companies knew and understood such boats would leak, some more and some less, requiring the daily use of the pump.
With that view Capt. Goddin was asked :
“ Q. 37. What do you know as to all cotton boats taking more or less water, and causing considerable running of the pumps ?”
E. A. Eindren was interrogated on this subject by a slightly different form of question — thus:
“Q. Will you state whether all of these cotton boats oil
*95 their trips and making landings will take more or less ■water and causing the use of her pumps ? How common is that ?”
We think the questions competent, and the answers, made within the scope of the questions, unobjectionable. The testimony would ascertain a fact, if such fact existed, in relation to this class of boats, and tend to show what the parties to the contract understood to be the meaning of the words in the policy, “ tight and sound.”
When put in the following form, as found in the testimony of E. L. Israel, it is objectionable:
“Q. 7. What do you know of boats carrying cotton taking more or less water, and causing her pumps often to throw water to their full capacity? Would you or not consider it unsafe to run a boat where her pumps are controlling the leak, though they might be throwing water an hour or two to their full capacity ?”
This question is two-fold, and, if fully answered, the answer wmuld also be two-fold. Tlie first part would seem to elicit the knowledge of the witness on a question in regard to wThich his testimony would be competent, while the second branch can only be answered by the witness giving his opinion in relation to a matter on which his opinion would not be competent.
The condition in which it would be proper and safe to run the Wade Hampton did not, in any known degree, depend upon the condition in which it would be proper and safe to run another steamboat. Whether it was prudent and safe to run the Wade Hampton, at any time after her increased leaking was discovered, was, so far as that question was in issue, a question of fact to be ascertained and determined by the jury from the facts and circumstances that surrounded her.
e. Exceptions were taken to such questions as sought from a witness an opinion, whether the Hampton could have received water in sufficient quantities from about her new outriggers to cause her to sink. Such questions are *96 substantially as No. 4, in tbe testimony of John 0. Sinnott, as follows:
“ On such a boat as tbe Hampton if thirty-two outriggers were not caulked, state whether or not, in your opinion, leakage from that source alone would cause her to sink, if the ordinary bilge pumps carried by such a boat, and an independent donkey pump in addition, were all in working order.”
This we think objectionable. Too many unknown conditions are involved ; such as the size of the openings about the outriggers, the extent and effect of the wedging about the new outriggers, the manner in which the Hampton was loaded, the manner in which the pumps were worked, etc. If all the facts relating to and affecting this question of leakage about the outriggers, were brought to the attention of the jury, an intelligent opinion and informed judgment could have been arrived at without the use of extrinsic opinion. The opinions of witnesses would only be competent when the fact to be determined is obscure and could only be made clear by and through the opinions of persons skilled in reference to the question.
/. Exception was taken to the admission of the following testimony:
E. A. Blank, who had been a steamboat captain ten years, testified:
UQ. No. 9. Do you know the James Howard, and what kind of a boat is she, and what effect might her swells have upon a passing steamboat, loaded ?
A. I know her, and she is a very large, heavy boat. If a loaded boat wras caught in the trough of her waves, it would have a very bad effect on her; if a boat were headed right against her waves it would not be as bad as if she were in the trough of them.
§. No. 10. What do you mean when you say her waves would have a bad effect on her?
A. It is liable to spring her butts and seams open.
Q. No. 11. What effect would that have upon a boat?
*97 A. It would 'cause her to leak.
Q. No. 12. To what extent might it cause her to leak ?
A. My opinion is that she might spring her butts and seams enough to sink her.”
E. A. Austion, a pilot on the Mississippi river for twenty-five years, testified that he knew the James Howard, and, when further interrogated, said:
“Q. How do the waves or swells of a very large boat like the Howard rock a loaded boat?
A. Meeting a boat like that it would have an effect on a boat like the Hampton on the guards or outriggers, that would have a tendency to open the seams of the outriggers and cause the caulking to fall out, which would have a tendency to let water in ; the waves are mighty severe on a boat in other ways unless her guards are down flat on the water.”
~We discover no valid objection to this testimony. The form of the questions to the witness Blank could have been improved, but his answers are unexceptionable. The actual effect of the waves made by the Howard on the Hampton was, and remains, unknown. In such case, experienced river navigators, who knew both boats and the general force of the waves or swells in the water made by the Howard, might give in testimony and say what would be their probable effect on the Hampton. In such case, the opinions of such skilled persons would be the best, and the only appropriate, testimony the subject-matter afforded.
g. Exception was taken to Q. 34 and answer of the witness Goddin. It is claimed they were wholly incompetent for any purpose. The witness, A. D. Hopkins was asked a question as follows, and answered :
“Q. 85. State whether or not you stated to Captain God-din, on the levee at New Orleans two o.r three weeks after the sinking of the Hampton, ‘that you had heard Captain Tobin would have trouble about insurance on the Hampton, *98 and that you thought it would be a five thousand dollars job to you ? ’
A. No, sir; for I supposed Captain Goddin to be one of the owners of the boat; I never supposed they had any trouble until a later day.”
Captain Goddin in answer to Q. 34, says he did have a conversation with A. D. Hopkins, such as is mentioned in the above question put to Hopkins at the time and place named. "We think the question, and answer of Goddin competent, as reflecting.upon the credibility of Hopkins’ statement.
The exception to Q. 7, and answer in the testimony of J. Y. Richardson; to Q. 2, and answer in the re-examination of the witness Joseph Williams, and to Q. 2, and answer in the testimony of F. A. Blank, were well taken.
III. We now come to consider the objections made by plaintiff below to testimony offered by defendants below, and excluded.
1. At Donaldsonville, the Wade Hampton and Lizzie Hopkins were laying near each .other. At that landing, Captain Goddin,'from some cause satisfactory to himself, had come to the conclusion the safety of the Hampton required the removal of a portion of her cargo. Acting with that purpose and necessity in view, he went to the steamboat Lizzie Hopkins to get permission to ship a portion of the Hampton’s cargo on board the Hopkins.
Captain Goddin was the accredited agent of the owners of the Hampton, charged, in this emergency, with the duty of acting and speaking for them. What he did and said in the discharge of his duty, while the danger to the vessel was upon her and calling for immediate action, with a view of saving her, were as much the acts and statements of her owners, and should have the same force and effect, as if the owners had been present in person and dictated his words, or spoken in their proper person.
Was the matter objected to competent testimony? When Captain Goddin reached the Hopkins, he asked the witness, Henry Rod, for the captain, who was absent. *99 Rod is then interrogated as to what took place between himself and Goddin. The answer is lengthy, and we will quote so much as will show the quality of the'.rejected testimony:
“ Q. 11. What did he say then ?
A.. He stepped up out of the yawl-boat, and told me that he was in a leaking condition or sinking condition, and told me that he was heavily loaded, that he had some new outriggers put in, and some were not caulked, and asked for the head clerk, Mi’. P. A. Charlet; he told me he knew the gentleman, or something like that; I did not pay much attention, as I had to watch the bank, and to watch the boat, as the wind was blowing; then he told me he would like us to take some of the cotton off his boat, and bring it to New Orleans, if we could take it off; I answered him that I had nothing to do with it, but would call the mate; when I told him about my power, he told me then to call the mate.”
The nature of Goddiu’s employment, and necessities of his positiou, made him the agent and representative of the owner’s of the boat. The Manchester, 8 Eng. Adm. 62. As such, his acts and statements, within the scope of his employment, are to be treated as res gestee. Story on Agency, § 134. Where the acts of the agent would be but dumb show, but for a meaning put into and upon them by his words, his words are to be treated, as verbal acts, and, whilst speaking clearly within the bounds of his employment and authority, are res-gestae. Hence the rule “that declarations of third persons are not admissible in evidence, as part of the res gestee, unless they in some way characterize or tend to give character to the act which they accompany, or derive a degree of credit from, the act itself.” 14 N. H. 101; 1 Greenleaf, § 440.
When the statements of Goddin, objected to, were made, he was acting clearly within the scope of his authority as master of the Hampton. He was in search of a specific help — to lighten his boat, by removing on board the Hopkins a portion of his cargo. • He acted in the belief *100 that to remove a portion of the cargo would raise the Hampton in the water, and thus escape the danger from the leak. TIis acts in going to solicit such aid from the Hopkins would have been meaningless, without his statements to give character to the act. His acts and words must go in as a whole, that his conduct on that occasion may have meaning. Tie was not narrating a past transaction, but stating a present need, induced by a pending danger, with what he then probably thought to be the cause of his wanting the present aid.
His conduct and words concerned the safety of the vessel, care for the cargo, and possibly the lives of the passengers. Considering the duties of the captain of the Wade Hampton, his obligations and authority, we have no doubt as to the competency of acts done and woi'ds spoken by him while on the Hopkins. This application of the doctrine of res gestee is supported by the authorities. 1 Ohio St. 26; 1 Greenleaf, § 113; Story on Agency §§ 134, 135; 4 Cush. 93; 34 Barb. 256; 6 Barb. 79; 4 Seld. 497; 12 Wheat. 460.
The following answer is objectionable, because it does not give the conversation between Captain Goddin and Mr. Charlet. What was said by Goddin does not appear with any certainty.
“ Q. What happened next ?
A. I told Mr. Charlet that the captain of the R. E. Lee wanted to see him ; then Mr. Charlet got up and came outside of his stateroom, and got speaking with Captain God-din ; then I stepped aside and heard him speaking about riggers, and about something else ; then I went below, and that’s all I know about it; and .1 told the gentleman ‘ that was all I could do for him.’ ”
2. The court erred in sustaining the objection to questions Nos. 49 and 53, put to Geo. M. Fredrick; also in excluding question and answer No. 19, in the testimony of P. A. Charlet; but ruled correctly in excluding questions Nos. 26, 29, and 30, in the testimony of MeHaffie.
Other objections to the admission or exclusion of test-i *101 mony were made by eách party. We think, from our examination, tbey are not of sufficient importance to require special notice. They are either not valid ones, or the testimony is of that unimportant description which frequently gets into a case, but can have no appreciable influence either way on the jury, as to the merits of the case.
Ve have endeavored to deal with the testimony, exceptions, and objections in such a manner that our views may afford a general guide upon like questions, in the further investigation of the case.

Judgment reversed, and cause remanded for a new trial.